UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRUSTEES OF THE NORTHERN CALIFORNIA TILE INDUSTRY PENSION TRUST FUND, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PREMIER STONE AND TILE, INC.,<br><br>Defendant. | Case No. 14-cv-03560-WHO<br><br>**ORDER GRANTING MOTION FOR ATTORNEYS' FEES AND COSTS**<br><br>Re: Dkt. No. 38 |

Plaintiff Trust Funds move for an order awarding them their attorneys' fees and costs incurred in this litigation that forced defendant Premier to submit to an audit. Premier objects, arguing that although plaintiffs were ultimately able to close their audit, plaintiffs did not prevail on the unpleaded but heavily investigated claim that companies related to but legally-distinct from Premier were the alter-ego of Premier. Premier also objects to the amount of fees sought, both in terms of the hourly rate and hours requested. For the reasons discussed below, I find that plaintiffs prevailed and are entitled to their reasonable fees and costs, but at a reduced amount in light of block billing and inefficiencies by plaintiffs' counsel.

**BACKGROUND**

**I. FACTUAL BACKGROUND**

Starting in March 2013, plaintiffs (Trustees of union Trust Funds[1]) audited the records of defendant Premier Stone and Tile, Inc. (Premier), pursuant to collective bargaining agreements

---

[1] Plaintiffs Tommy Conner, Otorniel Santos, David Jackson and Richard A. Papapietro are Trustees of the Northern California Tile Industry Pension Trust Fund, Northern California Tile Industry Health and Welfare Trust Fund, Northern California Tile Industry Apprenticeship and Training Trust Fund and Northern California Tile Industry Vacation and Holiday Trust Fund, and Northern California Tile Industry Labor Management Cooperation Trust Fund ("Trust Funds").

(CBAs). As part of the audit of Premier, plaintiffs' representative sought records regarding payments totaling several hundred thousands of dollars Premier made to several companies Control Your Assets, LLC (CYA), The Ultimate Consult, LLC (TUC), and Lorenzo Galleries International, LLC (LGI)) that are controlled by Lawrence Krulee, the father of Jana Krulee, the owner of Premier. Plaintiffs were concerned that those payments may have been payments by Premier for stone setting work covered by the CBAs. Declaration (Corrected) of David McReynolds (Dkt. No. 39), ¶¶ 3-5; *see also* Declaration of John J. Davis, Jr. (Dkt. No. 38-1), ¶¶ 16 – 22 & Exs. 14 – 20.[2]

Premier argues that in 2013, plaintiffs were provided access to all of the records they needed in order to audit Premier, that Premier gave plaintiffs additional assurances that CYA, TUC and LGI were not legally related to Premier, and that those entities were not doing tile work. Declaration of Jana Krulee (Dkt. No. 42-2), ¶¶ 3, 15 – 17. Plaintiffs were not deterred, however, because Lawrence Krulee appeared to be involved with Premier and was also affiliated with a non-union installation company (Take it for Granite (TIFG), which is owned by one of Lawrence Krulee's other children, Jason Krulee).[3]

In January 2014, the audit findings concluded that Premier owed approximately $20,000 in fringe benefits for work performed during June - July 2012, as well as approximately $440,000 in unpaid contributions plus liquidated damages. Davis Decl., Ex. 15. The $440,000 amount was attributable to the "accounts payable payments" made to CYA, TUC, and LGI by Premier for consulting, administration, or supplies. *Id.* Premier contested the audit findings and again explained to plaintiffs that the three companies were "legally unrelated" to Premier; that CYA is "an administrative company," TUC is a "consulting company," and LGI is a "materials and

---

[2] Plaintiffs admit that in 2013, Premier produced invoices for the payments made to CYA, TUC, and LGI, but argue that those invoices were devoid of any detail to allow their auditor to determine whether tile work was being done by those entities on behalf of Premier. Supp. McReynolds Decl. ¶ 3b.

[3] Declaration of Larry Krulee (Dkt. No. 42-3) ¶¶ 10-11. Jana's brother, Justin Krulee, also works at Premier. Davis Decl., Ex. 9 Tr. 126. Premier shares executive offices with Lawrence Krulee's three companies, as well as with Take it for Granite operated by Jason. Declaration of Richard Gordon (Dkt. No. 38-8) ¶ 7; Davis Decl., Ex. 9 Tr. 26, 111.

delivery company." Davis Decl., Ex. 16 (February 4, 2014 letter).[4]

Plaintiffs continued to seek additional documents regarding Premier's payments to the three Krulee companies. Davis Decl., Ex. 17; Supplemental Declaration of David McReynolds (Dkt. No. 44-1), ¶¶ 3, 5. In March 2014, plaintiffs asked Premier to produce additional documents Premier had received from or sent to CYA, TUC and LGI, as well as documents those companies provided to two entities Premier had done work for. Davis Decl., Ex. 18. In April 2014, Premier, through its counsel, refused to provide any additional information to plaintiffs' auditors because what was being sought was "not relevant" to the audit of Premier. Davis Decl., Ex. 19; *see also* McReynolds Decl. ¶ 4 ("Premier, and Larry Krulee, refused to provide me with such information").

## II. PROCEDURAL BACKGROUND

Plaintiffs Trustees filed suit on August 6, 2014, asserting a claim for breach of a collective bargaining agreement (CBA) and Trust Agreements established pursuant to Labor Management Relations Act § 302(c) (29 U.S.C. § 186(c)) for the purpose of providing employee benefits within the meaning of the Employee Retirement Income Security Act ("ERISA") sections 3 and 4. 29 U.S.C. §§ 1002 and 1003. Plaintiffs alleged that Premier was a signatory to a 2007 – 2011 CBA, and a subsequent 2011 – 2014 CBA, that required Premier to pay various wages and fringe-benefit contributions to its employees for tile setting work. The CBAs also required Premier to provide the Trustees with access to payroll "and other relevant records of any Employer at any reasonable time for the purpose of ascertaining whether contributions to the Trust Funds have been made as required by this Agreement." Davis Decl., Ex. 6 § 87 (2007-2011 CBA), Ex. 7 § 87 (2011 – 2014 CBA).

Plaintiffs alleged that their efforts to audit relevant records of Premier were frustrated because Premier "provided some records, but refused to provide Plaintiffs with many of the requested, relevant records that are necessary for the audit." Complaint ¶ 15. Therefore, plaintiffs sought an order requiring Premier to comply with its CBA obligations and specifically: (i) to

---

[4] I will refer to CYA, TUC, and LGI collectively as the "Krulee companies."

submit to an audit "for the period from February 17, 2011, to December 31, 2012"; (ii) to pay any contributions due; and (iii) to pay the Trustees their fees and costs in bringing this action. *Id*. at 5. The Complaint did not identify the documents that Premier had failed to provide, and did not allege that Premier was engaged in "alter ego" or other "double-breasting" activity in order to avoid its obligations to the Trust Funds.

After filing the action, plaintiffs met and conferred with Premier's counsel from Littler Mendelson and asked that firm to disqualify itself because one of the firm's partners was a Trustee of one of the plaintiff Trust Funds. Davis Decl., ¶¶ 24-30; Supplemental (Corrected) Declaration of John J. Davis, Jr. (Dkt. No. 45) Exs. 26-31. Premier's prior counsel refused, necessitating plaintiffs' preparation of a motion for disqualification. Premier's counsel acquiesced after being provided a copy of the motion, and the parties filed a joint stipulation continuing case deadlines and allowing for substitution of new defense counsel. Dkt. Nos. 14-15.

The parties proceeded with discovery. In November 2014, plaintiffs served 83 requests for production aimed primarily at uncovering any connection between Premier and the "other Krulee companies." Premier objected to each request, and after various in person and written meet and confers, the parties reached agreement in April and May 2015. Davis Decl., ¶¶ 31-32, 35-36; Supp. Davis Decl. ¶¶ 7-9; Supp. McReynolds Decl. ¶ 3a, c, e. The documents that were produced consisted largely of the same documents that were provided by Premier in 2013 to plaintiffs' auditors. Jana Krulee Decl. ¶¶ 8-9. According to plaintiffs' auditor, the only newly produced documents were: (i) Premier's month-by-month/project-by-project profit and loss information for 2011-2012 period; (ii) additional employee time cards from 2012; and (iii) documents from Larry Krulee explaining the payments received by his entities from Premier. Supp. McReynolds Decl. ¶ 3. The first two categories were relevant to the clarifying whether Premier owned $20,000 for work performed in June and July 2012, and the third category was relevant to determining the purpose of Premier's payments to the three Krulee companies (CYA, TUC and LGI).

The parties participated in mediation with the Hon. Joseph R. Grodin (Ret.), and reached an agreement to settle the dispute over the right of plaintiffs to audit Premier. Davis Decl., ¶ 39; Dkt. No. 33. In particular, because of the costs of ongoing litigation and business disruption,

Premier Stone and the three entities owned by Lawrence Krulee agreed to provide documents explaining the payments by Premier to the Krulee companies and documents showing that those three companies did not perform tile work. Krulee Decl. ¶¶ 17, 22-24; *see also* Declaration of Fred Storek (Dkt. No. 43) ¶ 4. In September 2015, plaintiffs conducted another audit of Premier, using the previously and newly produced documents, and determined that Premier was in compliance with its payment obligations. Supp. McReynolds Decl. ¶ 3e.[5] The consent agreement entered in this case acknowledged that Premier was in compliance with its fringe benefit payments for 2011 – 2012, and provides that plaintiffs' auditors will have access to Premier's documents as well as the records of CYA, TUC, and LGI. Dkt. No. 33.

Plaintiffs now move for an award of their fees and costs in bringing this action. Plaintiffs seek $245,435 in attorneys' fees and $6,142.79 in costs (through January 21, 2016); additional attorneys' fees of $32,150 and $405.07 in costs (through March 2016); as well as auditor fees and expenses of $19,009.33; for a total award of $277,585 in fees, $6,547.86 in costs and $19,009.33 in auditor fees.

## LEGAL STANDARD

Under ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g). The Ninth Circuit has held that a prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir. 1984) (internal quotations omitted). In the ERISA context, the test is not whether plaintiffs prevail on all of their claims, but whether they "succeed on any significant issue in litigation which achieves some of the benefit [they] sought in bringing suit." *Smith*, 746 F.2d at 589 (internal quotations omitted).

If a plaintiff is entitled to fees, the plaintiff "bears the burden of establishing entitlement to

---

[5] The Trustees initially believed that because of the payments from Premier to the three Krulee companies, Premier Stone owed the Trust Funds contributions. After the 2015 audit – which entailed a review of the documents produced by Lawrence Krulee and discussions with him – plaintiffs' forensic accountant determined that the payments were not for "covered work." Declaration of Richard Gordon (Dkt. No. 38-8) ¶ 14.

5

an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhardt*, 461 U.S. 424, 437 (1983). "When it sets a fee, the district court must first determine the presumptive lodestar figure by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate." *Secalt S.A. v. Wuxi Shenxi Const. Mach. Co., Ltd.*, 668 F.3d 677, 689 (9th Cir. 2012) (citation omitted); *Oster v. Std. Ins. Co.*, 768 F. Supp. 2d 1026, 1034 (N.D. Cal.2011) ("In ERISA cases, attorneys' fees to a prevailing plaintiff are determined by a lodestar analysis, multiplying the number of hours reasonably expended on the matter by a reasonable hourly rate.").

"Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Hensley*, 461 U.S. at 434. Accordingly, the district court should exclude from this initial calculation hours that were not "reasonably expended," including where a case is overstaffed or where claimed hours are "excessive, redundant, or otherwise unnecessary." *Id.* In the Ninth Circuit a "district court can impose a small reduction, no greater than 10 percent—a 'haircut'—based on its exercise of discretion and without a more specific explanation." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).

## DISCUSSION

### I. WERE PLAINTIFFS THE PREVAILING PARTY?

Premier argues that plaintiffs cannot be considered the prevailing party entitled to attorney fees under ERISA because plaintiffs did not achieve their main goal, an unpleaded attempt to prove that Premier was engaged in prohibited "alter ego" or "double-breasted" activities by paying CYA, TUC or LGI for "covered work" to avoid its CBA obligations. Defendant's Opposition (Dkt. No. 38) at 1; Murphy Decl. ¶¶ 8, 10. That focus is shown, according to Premier, by: (i) the parties' correspondence during the 2013 audit and during the litigation; (ii) the overbreadth and "alter-ego" focus of plaintiffs' discovery efforts; (iii) and the terms of the settlement agreed to by the parties. The aim of all of these efforts was to secure documents not from Premier for the limited time frame at issue, but from CYA, TUC, and LGI, as well as the testimony of Lawrence Krulee regarding a broader time frame.

Premier makes an interesting point. The CBAs at issue require that Premier allow

plaintiffs "to inspect or audit the payroll or other relevant records of any Employer . . . for the purpose of ascertaining whether contributions to the Trust Funds have been made as required" by the CBAs. Davis Decl., Ex. 6 § 87, Ex. 7 § 87. The only documents Premier is required to provide in an audit are *its own* documents. The flaw in Premier's argument is that in both the March 31, 2014, letter sent before the inception of the litigation and in the document requests served in this litigation, plaintiffs attempted to secure documents *in Premier's possession* about its payments to and relationship with CYA, TUC, and LGI. Davis Decl., Ex. 18, Ex. 21 (RFP 10-27, 31-33). When those efforts were unsuccessful – because the documents produced by Premier did not answer the auditors' questions and Premier refused to provide additional documents in its possession – plaintiffs filed suit to secure what they believed was needed to substantiate their initial audit findings. Merely because plaintiffs sought documents from third-parties (including Lawrence Krulee's companies, the company owned by the sibling of Premier's owner, and Premier's clients) does not mean that their efforts were not related to plaintiffs' injunctive-relief audit claim. Nor does Lawrence Krulee's testimony and agreement to provide documents from his companies in settling this case undercut plaintiffs' success on their audit claim.

Relatedly, Premier ignores that in the 2014 initial audit determination, plaintiffs assessed over $440,000 in benefits and damages against Premier related to the as-then insufficiently explained payments Premier made to CYA, TUC, and LGI. That after this lawsuit was initiated and documents provided to the auditors, the audit (at the executive offices shared by Premier, Take it for Granite, and Lawrence Krulee's companies) showed that the payments were not related to tile work, does not undermine plaintiffs' ultimate success through settlement in securing the information necessary to close their 2011 – 2012 audit.[6]

Finally, Premier has not rebutted plaintiffs' showing that, with respect to the initial 2014

---

[6] Premier complains that plaintiffs themselves compared this case to a "similar" case – *Trustees v. Peacock Tile and Marble, Inc.*, Case No. 11-cv-3859 DMR – in order to force the disqualification of Premier's prior firm. Oppo. at 1-2, 15; Defendant's Request for Judicial Notice (Dkt. No. 38-1). Premier's point, that the *Peacock* case was in fact a complaint about an alter ego/double-breasted shop, does not mean that this case was the same. Instead, this case has been about plaintiffs' efforts to uncover information from Premier to determine whether the $440,000 initial audit determination was appropriate.

audit determination that Premier owed approximately $20,000 for work performed in June and July 2012, documents were produced after the inception of this litigation (*e.g.,* month-by-month/project-by-project profit and loss records and additional employee records) that allowed the plaintiffs to resolve this issue. Supp. McReynolds Decl. ¶ 3a, e.

Premier's assertion that the whole point of this lawsuit, from their perspective, was plaintiffs' failed attempt to substantiate their alter ego and double-breasting suspicions without pleading that claim, is not persuasive.[7] Because the 2013 audit and initial determination in 2014 for the 2011 – 2012 period focused on the unexplained payments from Premier to Lawrence Krulee's companies, the injunctive relief claim sought to compel Premier to produce relevant documents so it could complete that audit. The documents provided and audit conducted in 2015 allowed plaintiffs to close the audit that is the subject of the complaint. Plaintiffs have prevailed on their audit claim.

## II. THE AMOUNT OF ATTORNEYS' FEES THAT SHOULD BE AWARDED

### A. Amount of Success

Premier argues that plaintiffs achieved no or limited success – and therefore should not be awarded fees – because the audit that was actually conducted as part of this litigation was not on Premier's documents, but on the Lawrence Krulee company documents. Moreover, Premier contends that because the 2015 audit showed that Premier was in compliance with its payments under the CBA and showed that Premier's representations about the Lawrence Krulee companies were true (those companies were not performing tile work), plaintiffs' lawsuit did nothing more than waste defendant's time and money.

But, as noted above, the express goal of plaintiffs' complaint was to be able to close the 2011 – 2012 audit. Plaintiffs alleged that they needed to see additional Premier documents to do that. Because Premier refused to provide them, plaintiffs filed suit. And because in settlement,

---

[7] Premier argues that plaintiffs' discovery efforts – aimed at third-parties – were vastly overbroad and not focused on the 2011 – 2012 audit period at issue. Oppo. at 2-5. That may be so, but Premier could have objected to that overbreadth and moved for a protective order. Instead, the parties reasonably negotiated an agreement on document production and testimony, obviating the need for Premier to seek relief from me.

Lawrence Krulee decided that providing his documents would be the best way to refute plaintiffs' suspicions, it is not surprising that the 2015 audit focused on those very documents.[8]  As noted above, after the 2015 audit took place and plaintiffs had Krulee's testimony, they were able to get answers to their questions and close the audit.

Premier also argues that under the CBA, attorneys' fees can be recovered only for audits and litigation that confirm an employer failed to make the required fringe benefit payments. However, the current CBA provides that if litigation is required to "compel the production of payroll records and other relevant records for audit," attorneys' fees and costs are recoverable. Davis Decl., Ex. 7 § 86.  With respect to whether this litigation was "necessary" to compel production of audit records under either the CBA or the Trust Agreements, Premier argues that it was not because Premier did not refuse to provide its own relevant records.  Premier relies on the its counsel's April 11, 2014, response to plaintiffs' March 31 pre-suit letter to argue that Premier did not refuse to produce any documents but, instead, asked plaintiffs to explain their relevance to the audit.  Davis Decl., Ex. 19 (4/11/14 Letter).  But plaintiffs responded on May 12, 2014, explaining their view of relevance.  Premier still did not agree to provide the additional documents.  Davis Decl., Ex. 20 (5/12/14 Response).

Premier also argues that the documents plaintiff sought pre-suit were not "relevant" to the audit and, therefore, there could be no breach of the CBA or Trust Agreement when Premier refused to produce them.  Plaintiffs respond that under the Trust Agreements, employers are required to produce "all" documents requested by the auditors that are necessary for "determining the accuracy of payments made by the Employer to the fund."  *See, e.g.*, Davis Decl., Ex. 1 § 6.9 (amended). Dkt. No. 38-2 at pg. 45.  The parties dispute whether the "relevant" or "all" language

---

[8] Premier contends that the settlement in this case was "legally contradictory" because it provides access to the Krulee company documents that, otherwise, plaintiffs would have no legal rights to audit.  Oppo. at 14-15.  However, in their March 31, 2014 pre-suit letter and in the discovery served on Premier, plaintiffs were seeking (for the most part) documents in Premier's possession. Document request No. 4 in the March 31st letter was the only request covering documents in the Krulee companies' possession, but the documents sought were regarding two of *Premier's* projects.  Davis Decl. Ex., 18.  Premier only provided additional discovery after a comprehensive negotiation which included staying other third-party discovery.  The fact that plaintiffs failed to show that the payments to the Krulee companies were improper does not mean plaintiffs achieved a legally contradictory result.

9

is more appropriate, but the bottom line is that the documents requested for an audit must bear on whether the Employer is complying with the payments required by the CBA and Trust Agreements. Premier does not identify *any particular* categories of documents requested in the March 31, 2014 pre-suit letter that it claims would not be related to this purpose. Nor does it identify which of the requests for production served in this case would not be related to this purpose. Plaintiffs certainly wanted to know whether the payments to the Krulee companies were for work covered by the CBA and, therefore, fringe benefit payments were owed to the Trust Funds, and they were seeking the requested documents in an attempt to get that answer.[9]

Premier also asserts that even if plaintiffs are entitled to fees, the amount requested should be substantially reduced. I will address Premier's specific fee-reduction arguments in turn.

### B. Fees for Disqualification Efforts

Premier argues that plaintiffs should not be entitled to any of the attorneys' fees spent seeking disqualification of Premier's prior law firm. Premier asserts that the motion for disqualification was premised on plaintiffs' ultimately unsuccessful "alter-ego" theory, because in justifying the disqualification request plaintiffs' counsel characterized *this* audit case as one that was similar to a prior "alter ego" case. *See* fn.6 *supra*. However, as discussed above, the point remains that plaintiffs were appropriately concerned – given the facts known to them – about the inadequately explained payments to the Krulee companies. That no alter-ego claims were actually pleaded in this case does not matter.

Premier also contends that the motion to disqualify was not necessary. Defendant argues that prior counsel ultimately voluntarily agreed to withdraw – preserving the objection that

---

[9] Premier relies on *Trs. of Mich. Reg'l Council of Carpenters Emple. Benefits Fund v. Exhibit Works, Inc.*, 868 F. Supp. 2d 592 (E.D. Mich. 2012) and to a lesser extent on *Central States v. Central Transp.*, 472 U.S. 559 (1985), to argue that audits cannot extend beyond what is "reasonably appropriate" for the proper administration of a benefits plan. But based on the evidence here, Premier has not shown that plaintiffs' audit requests went beyond what was "reasonably appropriate" given the large payments Premier made to the Krulee companies and the apparent connections between Premier, the Krulee companies, and Take it for Granite. *See, e.g.,* Davis Decl., Exs. 10-14. As to the discovery sought in this litigation, Premier could have sought a protective order and/or to quash third-party discovery, which is apparently what it intended to do before the parties reached an agreement obviating the disputes. *See* Murphy Decl., Ex. 21 (draft Joint Discovery Dispute Letter).

10

withdrawal was not necessary – and plaintiffs have failed to "prove" that their work on the disqualification was necessary to protect their clients' interests in this case. Oppo. at 20. However, Premier does not explain why the disqualification work was not justified *on its merits*. Moreover, in a declaration in support of plaintiffs' Reply, plaintiffs' counsel attached the correspondence exchanged between counsel regarding disqualification, as well as the draft motion to disqualify that was ultimately not filed. Davis Supp. Decl., Exs. 26-31. Having reviewed those submissions, I conclude that plaintiffs are entitled to reasonable fees in working on the disqualification issue.

### C.  Fees After the December 2014 "Offer"

Premier contends that it made a proposal on December 11, 2014, to provide plaintiffs with access to all of the records of Premier, as well as the three Lawrence Krulee companies and TIFG, in exchange for withdrawing the third-party discovery requests. That proposal would have allowed the audit 2011 – 2012 to be completed and effectively stayed this case. Murphy Decl. ¶ 11. The offer was rejected by plaintiffs, who claimed that they needed to complete the third-party discovery and to depose Mr. Krulee before considering whether they would be able to complete the audit. *Id*. Defendant points out that the final discovery agreement – which was still being negotiated according to plaintiffs through March 2015 – and the eventual settlement reached in May and finalized by July 2015, contained essentially the same terms. As such, Premier argues that plaintiffs should not be awarded fees for time spent after December 11, 2014. Oppo. at 19. Plaintiffs dispute whether defense counsel made a document production offer on December 11, 2014, or simply agreed to recommend that course of action to his client. Supp. Davis Decl. ¶ 8. But the records shows that a final discovery agreement, including the deposition of Lawrence Krulee, was not agreed to until March 2015 and documents were not produced until April and May 2015. Davis Decl. ¶ 32.

On the basis of the record before me, I cannot conclude that time spent by plaintiffs after December 11, 2014, was not necessary or productive to the case. Although it appears that both sides could have been more reasonable earlier in the litigation, plaintiffs dispute defendant's characterization of the status of the negotiations in December 2014, and the documents submitted

11

by Premier do not show otherwise.

### D. Hourly Rates and Lodestar

#### 1. Hourly rates

Plaintiffs seek the following hourly rates:  John J. Davis Jr. (admitted 1975) $650; Sara Grossman-Swenson (admitted 2008): $350; David L. Barber (admitted 2013): $250; and Alexander Ellebracht (not yet admitted): $150.  To support their requested rates, plaintiffs provide: (i) a 2014 fee award from a case litigated in San Francisco Superior Court, approving rates comparable to those sought here; (ii) the Laffey Index; and (iii) the Declaration of Richard M. Pearl, analyzing various rates approved by courts in the San Francisco Bay Area.  Davis Decl., Exs. 23 – 25.

Premier challenges the reasonableness of the requested rates, arguing that the rates for the type of ERISA action at issue – Trust Fund collection and audit cases – are simpler than other ERISA cases where more moderate hourly rates are normally charged.  Premier relies on its own survey of trust fund audit cases from this district (all default cases) where the rates requested and approved ranged from $185 to a maximum of $345 per hour.  Murphy Decl. ¶ 16, Ex. 24.  Premier also notes that plaintiffs' counsel does not actually specify what rates they charge their clients, only the rates they request to be awarded.  *See* Davis Decl. ¶¶ 45, 46.

I find that the rates of counsel in this case, which presented more complex issues than a typical Trust Fund collection case, are reasonable and approve them.

#### 2. Lodestar

Premier argues that the hours spent by plaintiffs are unreasonable, duplicative, and not necessary.  Defendant asserts a few broad objections and then annotates each of the hours claimed by plaintiffs' counsel with specific objections.  Murphy Decl., Ex. 23.  Initially, Premier argues that plaintiffs' counsel should not be awarded fees for seeking fees.  Oppo. at 20.  Premier also objects to "block billing" by plaintiffs' counsel, and argues that the hours should be reduced accordingly.  *See, e.g., Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007) (approving 20% reduction for block-billed time).  Finally, defendant asserts: (i) because a senior partner billed the majority of hours on this case, there was inefficient staffing of the case; (ii) there was

excessive consulting between attorneys; (iii) the senior partner and his associate spent multiple hours on the same tasks during the same timeframe, including both attending the Krulee deposition and mediation.

Having reviewed the time records and Premier's objections, I agree that there are inefficiencies. Not infrequently, multiple lawyers bill for the same simple or straight-forward task. *See, e.g.,* Davis Decl., Ex. 22 (9/2 and 9/3/14 entries for three attorneys reviewing same memo; 11/11 – 11/20/14 entities for multiple counsel re CMC statement). More significantly, the lion's-share of the work was performed by Mr. Davis, an extremely experienced lawyer who is being compensated at a high hourly rate. Given the work of (and hours claimed by) experienced associates who were assisting Mr. Davis, there were opportunities for more efficient staffing that were not taken advantage of. Finally, almost every time entry by Mr. Davis is "blocked billed" and includes work on many different types of tasks. *See, e.g.*, Davis Decl. Ex. 22 (7/14/14 5.10 entry, 12/11/14 4.70 entry, 1/20/16 8.2 entry).

Given these inefficiencies, which cannot be fully addressed otherwise given Mr. Davis' block billing, I find that plaintiffs' attorneys' fees request should be reduced by 20% across the board. Plaintiffs request a total award of $277,585 in attorneys' fees. After a 20% reduction, plaintiffs are awarded $222,068 in fees.

**E. Costs**

Plaintiffs seek litigation costs of $6,547.86 for filing fees, delivery and filing services, legal research services, deposition costs, mediation costs, and copying and postage. Premier complains that plaintiffs did not adequately explain "what those costs are for" but objects to any costs associated with plaintiffs' attempt to pursue their alter-ego theory. Oppo. at 24; Murphy Decl., Ex. 23 pgs. 52-60 (annotated objections to costs). I conclude that plaintiffs' litigation costs are reasonable and necessarily incurred in litigating this case.

Plaintiffs also seek an award of their auditors' fees and expenses to date, which amount to $19,009.33. Gordon Decl. ¶ 15 ($10,894.63); McReynolds Decl. ¶ 6 ($8,114.70). Premier contends these expenses are not justified nor were necessary because McReynolds is the Trustees' normal auditor and was already thoroughly familiar with the facts and documents at issue.

Therefore, according to Premier, there was no need to hire Mr. Gordon for forensic accounting. Premier also reiterates its argument that because the September 2015 audit only established that Premier did not own any additional fringe benefit payments for 2011 – 2012, and that the Lawrence Krulee companies were not covered by the CBA, these costs are not recoverable. Oppo. at 24.

Plaintiffs point out that the CBA and Trust Agreements provide that if it is necessary to file a suit to force an audit, "audit costs" and "other expenses" related to that litigation are recoverable. *See, e.g.,* Davis Decl., Ex. 1 § 6.6(c) & (d); Ex. 7 § 86. I conclude that the auditor and forensic accounting costs were reasonable and necessarily incurred in litigating this case.

Therefore I award plaintiffs their costs in this suit of $6,547.86 and their auditor costs of $19,009.33.

**CONCLUSION**

Plaintiffs' motion for attorneys' fees and costs is GRANTED. Plaintiffs are awarded $222,068 for attorneys' fees, $6,547.86 for costs, and $19,009.33 for auditor costs.

**IT IS SO ORDERED**.

Dated: March 28, 2016



WILLIAM H. ORRICK
United States District Judge